## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOSEPH P. SHERBAUGH,

    Plaintiff,

-vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY

    Defendant.

)
)
)
)
)   Civil Action No. 09-1268
)
)
)
)
)
)

AMBROSE, District Judge.

## OPINION and ORDER OF COURT

### SYNOPSIS

Pending before the Court are Cross-Motions for Summary Judgment. (Docket Nos. 8 and 10). Both parties have filed Briefs in Support of their Motions. (Docket Nos. 9 and 11). After careful consideration of the submissions of the parties, and for the reasons discussed below, Plaintiff's Motion (Docket No. 8) is granted insomuch as it requests a remand not inconsistent with this opinion and Defendant's motion (Docket No. 10) is denied.

### I. PROCEDURAL BACKGROUND

Plaintiff has brought this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), for review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Act, 42 U.S.C. §§ 401-433, 1381-1383f.

On August 26, 2005, Plaintiff protectively filed the instant applications for DIB and SSI alleging disability since January 1, 2005, due to cancer and dysphagia. (R. 77-79). Plaintiff's claims were denied at the initial level. (R. 26-27, 68-72). Plaintiff requested a hearing. (R. 64).

Administrative Law Judge Douglas Abruzzo ("ALJ") held a hearing on March 7, 2007, at which time plaintiff, who was represented by counsel, and a vocational expert testified. (R. 675-739). On July 24, 2007, the ALJ denied plaintiff's claim for benefits finding that he was not disabled under the Act. (R. 17-25). The Appeals Council denied plaintiff's request for review. (R. 7-9). After thus exhausting his administrative remedies, plaintiff filed the instant action.

The parties have filed cross-motions for summary judgment. Plaintiff raises four main issues on appeal. First, he claims that the ALJ erred in finding all of his impairments as non-severe. (Plaintiff's Brief, 7). In addition, he argues that the ALJ improperly rejected the findings of his treating doctors. (Plaintiff's Brief, 9). Third, Plaintiff contends that the ALJ erred in finding he did not meet Listings 12.04 and 12.06. Finally, he argues that, due to these inadequacies, the hypothetical question presented to the vocational expert was deficient. (R. 13).

## II. FACTUAL BACKGROUND

Plaintiff was thirty-eight years old at the time of the ALJ's decision and is, therefore, considered a "younger individual" under the regulations. 20 C.F.R. §§ 404.1563, 416.963. Plaintiff graduated from college, earning a degree in computer science. (R. 681). Plaintiff's prior work experience included work as a machine operator in a metal shop, as a manager in a convenience store, as a worker in a lumber yard, and as a self-employed computer technician, repairing and building computer systems and networks. (R. 103, 107).

Plaintiff was admitted to Latrobe Hospital's emergency room in April 2005 with complaints of sore throat and inability to eat or swallow. (R. 227). He was given antibiotics and discharged. Id. In May and June of 2005, Plaintiff was treated for chronic sinusitis and trouble swallowing by Dr. Oscar Reyna, his primary care physician. (R. 271-274). A CT of the sinuses revealed bilateral maxillary mucous retention cysts, bilateral fluid in the maxillary sinuses, and mild ethmoid inflammatory disease on the left. (R. 273). Dr. Reyna noted that Plaintiff was

2

having difficulty swallowing due to half of his tongue feeling numb. (R. 274). Plaintiff reported that he was experiencing shaking, difficulty sleeping, and could only eat soft foods. Id. Plaintiff underwent a barium cookie swallow, which was normal. (R. 270).

Plaintiff underwent a CT of the neck on August 25, 2005, which showed probable debris or secretions in the vallecula or crevice of the tonsil. (R. 260). On the same date, Dr. Reyna completed a form opining that Plaintiff was permanently disabled starting in May 2005 due to cancer and dysphagia with related malnutrition. (R. 261-262). On September 2, 2005, Plaintiff was admitted to the hospital through Dr. Reyna's office for a diagnosis of possible metastatic cancer. (R. 199). Plaintiff had been scheduled for an excision biopsy the following week, but began experiencing shallow breathing and neck and leg spasms. (R. 199). The admitting doctor noted two prior emergency room visits for the same issues earlier in the same week. Id. On physical examination, the admitting doctor noted that Plaintiff was a thin, cathetic, somewhat depressed looking individual who was only able to consume Ensure. Id. Plaintiff was diagnosed with a left tonsillar lesion and underwent a left tonsillectomy. (R. 181, 188). A biopsy revealed that the lesion was benign. (R. 242).

Plaintiff was readmitted to the hospital on September 15-16, 2006 and September 20, 2005 due to recurrent postsurgical bleeding after the surgery and anxiety and suspect underlying depression. (R. 155, 242). Plaintiff's wife reported that he was depressed because he could not eat or swallow. (R. 243). He was sedated with Ativan in the emergency room due to anxiety. (R. 242). Dr. Reyna reported that Plaintiff had been admitted to mental health for depression and anxiety as a child. Id. Dr. Reyna reported that Plaintiff was "very panicky," "extremely anxious" and "very emotionally upset for minimal things." (R. 242-243). Plaintiff was placed on Lexapro and Xanax for anxiety and depression and Tylenol for pain. (R. 242). Plaintiff was released on September 22, 2005. Id.

3

Plaintiff was examined by Dr. Reyna on October 6, 2005 for follow-up of his surgery, depression, and anxiety. (R. 254). Plaintiff reported that his appetite was better, but that he did not believe the Ativan was helping his depression. Id. On October 21, 2005, plaintiff was evaluated by Dr. Michael Weinberg, a primary care physician for continued complaints of dysphagia, weight loss, and tremors. (R. 301). On examination, Dr. Weinberg noted excessive weight loss and the appearance of malnourishment with weight of 142 pounds, an enlarged thyroid on the left, and a resting tremor bilaterally. (R. 301-302). Plaintiff returned to Dr. Weinberg on October 27, 2005 and the same findings were repeated. (R. 299-300). Lab tests revealed thyroid antibodies and thyroid uptake was abnormally low. (R. 300, 304). Dr. Weinberg also ordered an endoscopy, which was performed on November 2, 2005. (R. 275). The endoscopy revealed moderately severe gastritis, a small hiatal hernia and mild reflux-induced esophagitis. (R. 276). Plaintiff was diagnosed with reflux esophagitis, chronic gastritis, and a hiatal hernia. (R. 275). On follow-up Dr. Weinberg placed plaintiff on achiphex for his gastritis and esphagitis and diagnosed plaintiff with thyroiditis and placed him on Corgard. (R. 298).

On December 5, 2005, Plaintiff was evaluated by Dr. S. Kowalyk for his thyroid difficulties. (R. 322-323). Based on the test results, Dr. Kowalyk diagnosed thyroid toxicosis. (R. 323). As a possible secondary diagnosis, he noted anxiety due to symptoms that were disproportionate to the thyroid levels. Id. He was continued with the beta blocker and an ultrasound was ordered. Id. Plaintiff was examined in the emergency room of Latrobe Hospital on December 6, 2005 due to tachycardia, hypothyroidism, and non-cardiac chest pain. (R. 333). He was admitted overnight and the doctors noted "suspected hypothyroidism" and an EKG was ordered. (R. 333-335). On December 21, 2005, Plaintiff underwent an ultrasound of the thyroid gland, which showed "some enlargement" of both lobes of the thyroid. (R. 321). Plaintiff

4

returned to Dr. Weinberg on December 22, 2005 for a cardiac check and thyroid check. (R. 559). Plaintiff's gastritis and goiter were noted as "better." Id. He noted that both lobes of the thyroid were enlarged. Id.

On January 1, 2006, Dr. Richard Heil, a state agency consulting psychiatrist, opined that Plaintiff was not suffering from any severe mental impairments. (R. 282). He noted mild limitations in the activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, and pace. (R. 292). Plaintiff returned to Dr. Weinberg on January 13, 2006 for a thyroid follow-up. (R. 296). Dr. Weinberg again noted that both lobes of Plaintiff's thyroid were enlarged and that he had a resting tremor bilaterally. (R. 297). Plaintiff had a normal thyroid uptake scan on February 9, 2006. (R. 320). Plaintiff was examined by Dr. Kowalyk on February 23, 2006 after receiving radioiodine treatment for his thyroid on February 17, 2006. (R. 319). Plaintiff developed a rash after treatment and was prescribed a Medrol dose pack, which cleared the rash. Id. Plaintiff complained of neck pain that Dr. Kowalyk noted was not thyroid related. Id. Dr. Kowalyk noted that Plaintiff's thyroid appeared to be normal and ordered thyroid tests to be performed every other week. Id. Plaintiff returned to Dr. Weinberg on February 24, 2006 for his gastritis and thyroid. (R. 554). Dr. Weinberg noted that treatment of the gastritis with steroids had made Plaintiff worse and he was instead started on Nexium. (R. 553).

Plaintiff was admitted to the emergency room at Latrobe Hospital on March 7, 2006 for difficulties with two episodes of an "adrenaline rush" and continued fatigue. (R. 342). Hospital doctors noted possible sinus tachycardia, anxiety/panic attack, and hypothyroidism. (R. 344). Plaintiff returned to Dr. Weinberg the next day for a follow-up to his emergency room visit. (R. 549). Plaintiff described a possible seizure where his body went very stiff and he began to

5

shake all over. Id. Dr. Weinberg noted an additional radiation therapy for plaintiff's thyroid on February 23, 2006. Id. Dr. Weinberg reported that Plaintiff was malnourished with an enlarged thyroid and resting tremor. (R. 549-550). Plaintiff returned on March 31, 2006 with a worsening on his swallowing difficulty. (R. 544). Plaintiff was referred to both a gastroenterologist and an endocrinologist. (R. 545).

Plaintiff was evaluated by Dr. C. Rao Punukollu for his difficulty swallowing on April 11, 2006. (R. 482). His physical examination was normal. Id. Dr. Punukollu noted that Plaintiff was possibly having difficulty with scar tissue in his throat from his prior surgery but decided to rule out other causes first. Dr. Punukollu ordered a barium swallow, and if necessary, a repeat upper endoscopy. Id. Plaintiff was started on a stool softener and it was noted that a colonoscopy might be necessary due to significant weight loss. Id. On April 12, 2006, plaintiff was evaluated by Dr. Mark Klingensmith of Westmoreland Head and Neck Surgery. (R. 578). Dr. Klingensmith noted a palpable neck mass. Id. Plaintiff's examination was normal except for moderate erythma and edema of the cords. Id. Dr. Klingensmith strongly recommended that Plaintiff discontinue the use of tobacco due to the increased risk of malignancy and recommended that he be placed back on reflux precautions. He suggested a return visit after Plaintiff was given a barium swallow. (R. 579).

On April 15, 2006, Plaintiff was again seen in the emergency room for complaints of dyspnea and rapid heart rate. (R. 354). He was diagnosed with tachycardia due to hypothyroidism. (R. 370-371). Plaintiff returned to the hospital on April 19, 2006 due to a further episode of tachycardia. (R. 443). Plaintiff reported dizziness, a hard time breathing, and mid-epigastric pain after eating. (R. 445). Plaintiff had a follow-up the next day with Dr. Weinberg. (R. 537-538). Dr. Weinberg noted that Plaintiff's thyrotoxicosis, dyskinesia of the esophagus,

6

and tachycardia were no better. Id. He placed Plaintiff on Toporol. Id. Plaintiff returned to Dr.

Punukollu on April 25, 2006 for follow-up. (R. 480). Dr. Punukollu noted that a barium swallow

was normal, but an upper endoscopy revealed a small hiatal hernia and a pharyngeal pouch,

which was noted as a possible cause of Plaintiff's dysphagia. (R. 464-477, 480). A second

barium swallow was ordered. Id. Plaintiff's second barium swallow was normal. (R. 461).

On May 12, 2006, Plaintiff returned to Dr. Weinberg for follow-up regarding his

tachycardia, thyroid, and difficulty swallowing. (R. 533). Dr. Weinberg noted that Plaintiff was

"extremely frustrated." Id. Plaintiff's Toporol was discontinued and Atenolol was added. (R. 534).

Plaintiff was psychiatrically evaluated by Dr. Ronald Orr on May 17, 2006. (R. 592-594).

Plaintiff reported that "his mind was messed up." Id. Plaintiff reported his past psychiatric history

as involuntary electroconvulsive therapy at ages 10 and 11, group home placement, and two

suicide attempts at ages 14 and 16. Id. Plaintiff reported that his wife was not supportive and

verbally abusive towards him. Id. On mental status examination, Plaintiff was noted as being

emaciated with poor eye contact, a frustrated and anxious mood, a very restricted affect,

delusional thoughts of a somatic nature, and fair insight and judgment. Id. Plaintiff was

diagnosed with adjustment disorder with depressed and anxious mood and rule out delusional

7

disorder, somatic type with a GAF of 50.[1] Plaintiff was prescribed Abilify, Lexapro, and therapy.
Id.

On June 1, 2006, Plaintiff returned to Dr. Kowalyk for a thyroid check. (R. 316). Dr. Kowalyk reported that his thyroid levels were normal but that Plaintiff continued to have difficulty swallowing and neck pain. Id. Dr. Kowalyk opined that these difficulties were unrelated to Plaintiff's thyroid and recommended follow-up elsewhere. Id. Plaintiff was continued on a low dosage of Tapazole and Atenolol was reduced. Id. Plaintiff's blood pressure was noted as low. Id. Plaintiff returned to Dr. Weinberg on June 6, 2006 for a thyroid check. (R. 523). Dr. Weinberg noted that Plaintiff was anxious, noted that his thyroid had improved, but also noted that his dysphagia was unchanged. (R. 524). Dr. Weinberg completed a form noting that Plaintiff was temporarily disabled from June 6, 2006 to June 6, 2007 due to uncontrolled thyroid, dysphagia, and malnutrition. (R. 310). Plaintiff was examined again on June 20, 2006. (R. 521). Dr. Weinberg noted that Plaintiff was now hypothyroid and that his dysphagia continued to be unchanged. (R. 522).

---

[1]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. A GAF score of between 41-50 denotes serious symptoms. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation . . . .)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., . . . suicidal preoccupation)" or "inability to function in almost all areas . . .; of 20 "[s]ome danger of hurting self or others . . . or occasionally fails to maintain minimal personal hygiene . . . or gross impairment in communication . . . ." Id.

On July 6, 2006, Plaintiff returned to Dr. Weinberg for a check-up and was referred to Dr. Kevin McGrath, a gastroenterologist. (R. 517). Plaintiff returned to Dr. Weinberg on July 20, 2006 for a thyroid check. (R. 515). Continued difficulties were noted with swallowing. Id. He was again examined by Dr. Weinberg on August 17, 2009 at which time a diet was discussed and a gallbladder ultrasound was ordered. (R. 512). On August 19, 2006, Plaintiff had an unremarkable ultrasound of the upper right quadrant. (R. 509). Plaintiff was evaluated by Dr. Kevin McGrath on September 1, 2006. (R. 505). Plaintiff reported left-sided neck discomfort and solid-food dysphagia. Id. Dr. McGrath noted that Plaintiff had suffered a forty pound weight loss and was only consuming Ensure and milkshakes. Id. Dr. McGrath opined that Plaintiff's difficulties were not an esophogeal issue and placed Plaintiff on Flexeril for his neck problem, arranged for a modified barium swallow, and referred him to Dr. Ric Carrau. (R. 506).

Plaintiff was rechecked on September 5, 2006 by Dr. Weinberg, who noted no changes in Plaintiff's condition. (R. 503). Plaintiff was evaluated by Dr. Ric Carrau, an ear, nose, and throat specialist, on September 26, 2006. (R. 632-633). Dr. Carrau noted Plaintiff's modified barium swallow, which was mostly normal but indicated some "transient filling of a small hypopharyngeal pouch." (R. 637-638). Plaintiff was placed on Prilosec and Pepcid. (R. 633). Plaintiff returned to Dr. Weinberg on September 29, 2006 for worsening dysphagia. (R. 494). His Pepcid prescription was modified. (R. 495). On October 24, 2006, Dr. Weinberg composed a letter indicating that Plaintiff was totally disabled due to "severe esophageal dismotility resulting in a 50# weight loss over the last year causing continuous profound weakness due to muscular atrophy" and "uncontrolled hypothyroidism leading to tachyarrhythmias with even minimal physical activity." (R. 307).

9

On November 1, 2006, Plaintiff had a medication check with his psychologist and his Lexapro and Abilify were continued. (R. 591). Plaintiff reported that these medications were not particularly helpful. (R. 590). Plaintiff had a follow-up with his ear, nose, and throat specialist on November 7, 2006, who noted the need of an MRI of the brain and possible balloon dilation, biopsies, direct larnygoscopy, and esophagoscopy were contemplated. (R. 623). On November 20, 2006, Plaintiff underwent a direct laryngoscopy, biopsies of the base of the tongue, and esophagoscopy were performed resulting in a diagnosis of odynophagia. (R. 626). Plaintiff had a second medication check with his psychiatrist on November 30, 2006 and his Lexapro and Abilify were increased. (R. 591). On mental status examination, Dr. Orr noted that Plaintiff's mood was anxious and sad, affect restricted and dysphoric, thought process goal-directed and coherent, and insight abnormal with a GAF of 50. (R. 589). On December 5, 2006, Dr. Michelle Stevens, a neurologist, evaluated Plaintiff and referred him for an MRI of the brain and cervical spine to evaluate for any brain stem pathology, syrinx, or structural cause of his dysphagia. (R. 612).

On January 24, 2007, Dr. Orr composed a letter indicating his belief that Plaintiff was suffering from significant depression and anxiety that would "compromise his ability to function effectively in a work setting." (R. 376). He reported that Plaintiff had difficulty concentrating, following instructions, and interacting with others in an appropriate fashion. Id. He noted attempts at treatment with anti-depressants. Id. Plaintiff had a medication check on January 24, 2007 at which time his Zoloft was decreased and Klonopin added. (R. 591). On mental status examination, Dr. Orr noted that Plaintiff was worse with motor retardation, anxious and sad mood, restricted affect, and abnormal insight with a GAF of 50. (R. 588). On January 31, 2007, Dr. Orr completed a report noting diagnoses of major depressive disorder and anxiety disorder,

10

not otherwise specified. (R. 567). He also noted that Plaintiff had attended all medication checks as well as therapy. (R. 568). Dr. Orr opined that very little progress had been made in treating Plaintiff's anxiety and that various medications were being utilized. Id. Dr. Orr reported that Plaintiff's prognosis was poor and that he would likely require treatment for many years. Id. Dr. Orr opined that Plaintiff would have a seventy-five percent permanent disability due to his anxiety and depression and met Listing 12.04, 12.06, and, if no physiological cause was found for Plaintiff's swallowing difficulties, 12.07. (R. 568-569). Dr. Orr reported Plaintiff's symptoms as appetite disturbance and weight change, mood disturbance, recurrent panic attacks, anhedonia, pervasive loss of interests, psychomotor retardation, feelings of guilt/worthlessness, difficulty thinking/concentrating, social withdrawal, flat affect, decreased energy, generalized persistent anxiety, and somatization. (R. 580). He noted that Plaintiff's symptoms resulted in difficulty concentrating, maintaining a routine work pace, handling criticism, and interacting appropriately with others. (R. 582). Dr. Orr opined that Plaintiff had marked restrictions in the activities of daily living, maintaining social functioning, and in maintaining concentration, persistence, and pace with four or more episodes of decompensation, each of extended duration. (R. 583). He further opined that Plaintiff would have poor to no ability to relate to others, deal with the public, interact with supervisors, deal with work stresses, function independently, behave in an emotionally stable manner, relate predictably in social situations, demonstrate reliability, and understand, remember, and carry out complex job instructions. (R. 585-587).

Plaintiff returned to Dr. Stevens on February 3, 2007 after he completed speech therapy. (R. 608). Plaintiff reported continued difficulties swallowing, fluctuations in weight, and occasional double vision. Id. He also complained of fatigue. Id. On examination, Dr. Stevens noted evidence of bulbar dysfunction with slow tongue movements and mild bifacial weakness.

11

(R. 609). She ordered acetylcholine receptor testing and gave Plaintiff a trial of prednisone and

Mestinon, used for the treatment of myasthenia gravis[2]. Id. She noted that if the antibodies were

negative, she would get an EMG with repetitive stimulation to further test for myasthenia or a

neurodegenerative condition. Id. Plaintiff returned to Dr. Stevens on March 20, 2007 and

reported that his swallowing dysfunction was doing "much better" since starting Mestinon. (R.

603). He reported that he was able to eat solid foods such as chicken patties and meatballs and

had gained some weight back. Id. Plaintiff noted that he had stopped the Prednisone due to

swelling in his hands, but experienced no side effects from Mestinon.Id. Plaintiff did report

continuing fatigue and shortness of breath. (R. 604). Dr. Stevens noted that an EMG showed no

signs of neuromuscular junction disorder and that acetylcholine receptor binding and blocking

antibodies were negative. Id. She ordered acetylcholine modulating antibodies testing and anti-

MUSK antibody testing. Id. She noted that she suspected myasthenia gravis and reinstituted

prednisone. Id. She referred Plaintiff to Dr. Rao. Id.

Plaintiff testified at the hearing before the ALJ on March 7, 2007. (R. 677). Plaintiff

testified that his prior work included work as a machine operator, metal worker, convenience

store manager, and self-employed computer technician. (R. 684-687). Plaintiff testified that his

swallowing difficulty was, at first, mis-diagnosed as cancer and that his second doctor

determined that he was suffering from hyperthyroid difficulties. (R. 691-692). He noted suffering

from tachycardia at the time. (R. 691). He also noted a recent diagnosis of myasthenia gravis

---

[2] Myasthenia gravis interferes with messages nerves send to muscles. Myasthenia
gravis often affects muscles in the head. Common symptoms are trouble with eye and eyelid
movement, facial expression and swallowing. U.S. National Library of Medicine/ National
Institutes of Health, "Myasthenia Gravis," available at:
http://www.nlm.nih.gov/medlineplus/mystheniagravis.html (last visited June 2, 2010).

12

and treatment with Mestinon and Prednisone. (R. 692, 695-696). Plaintiff reported that he had

been at UPMC medical center the day before for further testing. (R. 696-697). Plaintiff testified

that he could shower, if he took his time, and drink canned liquid foods, but had not driven since

2006 due to fears of losing muscle control. (R. 699-700). He also testified that he could dust a

table and lamp, sweep for about five minutes, mop a floor, put dishes in the dishwasher, and

could go grocery shopping if using an electric cart. (R. 699-700). He noted that he could not

vacuum because pushing the vacuum made him tired. (R. 699). He testified that he would sleep

most of the day, watch TV about two hours per day, and email. (R. 701-702).

Plaintiff reported that he was told he was in the second stage of myasthenia gravis and

to significantly limit his exercise due to muscle fatigue and trouble talking and swallowing. (R.

706). Plaintiff noted tremors in his arms and hands that caused his doctor to limit him to lifting

two pounds at a time. (R. 707). He also reported difficulty standing for more than five to ten

minutes, dizziness, weather-sensitivity, and low energy level. (R. 708-710). He noted that

radiation had solved his thyroid difficulties. (R. 710). He also noted his treatment for depression

and anxiety with Dr. Orr. (R. 710).

Following Plaintiff's testimony, the ALJ posed a hypothetical to the vocational expert and

the vocational expert testified that an individual with the proposed limitations could perform a

significant number of jobs as they exist in the national economy. (R. 725-739).

On July 24, 2007, the ALJ rendered his opinion on plaintiff's disability. He found as

follows:

> 1.  The claimant meets the insured status requirements of the
>     Social Security Act through December 31, 2009.
>
> 2.  The claimant has not engaged in substantial gainful activity
>     since January 1, 2005, the alleged onset date (20 CFR

13

404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.      The claimant has the following medically determinable impairments: tonsillectomy, hypothyroidism, tachycardia due to hypothyroidism, dysphagia, depression, anxiety, kidney problems and gastritis. (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments (20 CFR 404.1521 and 416.921).

5.      In the event some reviewing authority should find that the claimant does have a severe impairment, the claimant would have the residual functional capacity to engage in the full range of work at the medium exertional level. However, he would need to avoid ladders, ropes and scaffolds in excess of four steps and unprotected heights; for sedentary work only, must be afforded a sit/stand option that permits the claimant to take four or five steps away from his workstation during a one minute period up to five times an hour; would need to avoid prolonged hot and cold temperature extremes and extreme wetness and humidity, and would be limited to occupations which allow brief access to a restroom every 2 to 2-1/2 hours during the work day and can be performed wearing an incontinence protection pad. Therefore, there is an alternative factual basis for a finding of not disabled at Steps 4 and 5.

6.      Assuming that the claimant did not have severe impairments, which he does not, he is capable of performing past relevant work as a security guard, DOT Code 372.667-034, which was classified as light, semi-skilled work activity; a retail manager, DOT Code 185.167.046, and a convenience store manager, which were classified as light, skilled work activity, and a machinist bender, DOT Code 600.290-022, a computer systems design worker, DOT Code 039.264-010, and a computer technician, DOT Code 828.261-022, which were

> classified as medium, skilled work activity. This work does
> not require the performance of work-related activities
> precluded by the claimant's residual functional capacity (20
> CFR 416.965).

> 7. The claimant has not been under a disability as defined in
> the Social Security Act from January 1, 2005 through the
> date of this decision (20 CFR 404.1520(c) and 416.920(c)).

(R. 11-17).

### III. LEGAL ANALYSIS

#### A. Standard of Review

The standard of review in a social security case is whether substantial evidence exists in

the record to support the Commissioner's opinion. Allen v. Bowen, 881 F.2d 37, 39 (3d Cir.

1989). Substantial evidence has been defined as "more than a mere scintilla. It means such

evidence as a reasonable mind might accept as adequate."Ventura v. Shalala, 55 F.3d 900,

901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Additionally, if

the Commissioner's findings of fact are supported by substantial evidence, they must be

accepted as conclusive. 42 U.S.C. 405 (g); Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.

1979). In making this determination, the district court considers and reviews only those findings

upon which the ALJ based the decision, and cannot rectify errors, omissions or gaps therein by

supplying additional facts from its own independent analysis of portions of the record which

were not mentioned or discussed by the ALJ. Fargnoli v. Massarini, 247 F.3d 34, 44 n.7 (3d Cir.

2001).

To demonstrate disability and eligibility for social security benefits under the Act, the

plaintiff must demonstrate an inability to "engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423 (d)(1)(A);Brewster v. Heckler, 786 F.2d 581, 583 (3d Cir. 1986). When resolving the issue of whether a claimant is disabled and whether a claimant is entitled to DIB benefits, the ALJ applies a five step analysis. 20 C.F.R. § 404.1520 (a).

The ALJ must determine: (1) whether the claimant is currently engaging in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if the claimant has a severe impairment whether it meets or equals the criteria listed in 20 C.F.R. pt. 404. subpt. P, app. 1; (4) if the impairment does not satisfy one of the impairment listings, whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy, in light of his age, education, work experience and residual functional capacity. 20 C.F.R. § 404.1520. In all but the final step, the burden of proof is on the claimant. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); 42 U.S.C. §§ 416(1), 423(d)(1)(A).

A district court, after reviewing the entire record may affirm, modify, or reverse the decision with or without remand to the Commissioner for rehearing. Podedworny v. Harris, 745 F.2d 210, 221 (3d Cir. 1984).

B. Severe Impairments

Plaintiff argues that the ALJ erred in finding that none of his impairments constituted a severe impairment within the meaning of the Act. Specifically, he notes his hyperthyroidism, depression and anxiety, and myasthenia gravis. An impairment is severe if it imposes significant restrictions in the ability to perform basic work activities. Social Security Ruling 85-28. "An impairment or combination of impairments can be found 'not severe' only if the evidence

16

establishes a slight abnormality or a combination of slight abnormalities which have 'no more than a minimal effect on an individual's ability to work.'"Newell v. Commissioner of Social Security, 347 F.3d 541, 546 (3d Cir. 2003) citing SSR 85-28. "The severity step...should only be used to screen out de minimis claims." Roberts v. Massanari, 2001 WL 1580241, *3-4 (E.D.Pa., Dec. 10, 2001)(citing Bailey v. Sullivan, 885 F.2d 52, 56-7 (3d Cir.1989)).

It is evident that the ALJ erred in finding no severe impairments at step two. Plaintiff suffered from difficulty swallowing starting in early 2005 with these problems being tied to multiple ailments including hyperthyroid, thyroid toxicosis, anxiety and depression, and myasthenia gravis. The record indicates a mis-diagnosis of cancer with accompanying surgery early in Plaintiff's treatment. (R. 181, 199). By December of 2005, Plaintiff had been diagnosed with thyroid toxicosis, which required radiation treatment to remedy. (R. 298, 321, 323). It is evident that Plaintiff's thyroid problems, along with other difficulties, caused tachycardia, which required multiple trips to the hospital, and contributed to his significant weight loss. (R. 332, 344, 354, 443). Plaintiff was also treated concurrently for moderately severe gastritis. (R. 276, 298, 553). Notably, by early 2007, Plaintiff's neurologist and primary care physician were considering myasthenia gravis as the likely cause of Plaintiff's long term swallowing difficulties. (R. 604, 609).

In his opinion, the ALJ insinuates that none of Plaintiff's ailments lasted for longer than twelve month period or rose to the level of severity required by the Act. (R. 20). Despite these contentions, it is evident that Plaintiff had continuous difficulty with tremors, swallowing, fatigue, and tachycardia that were tied to multiple ailments including hyperthyroid, thyroid toxicosis, anxiety, depression, and myasthenia gravis. Plaintiff mainly subsisted on a liquid diet, which resulted in a fifty pound weight loss and accompanying malnutrition. (R. 307). He required

17

surgery, multiple tests, radiation therapy, medication treatment, and periodic medication changes. This was much more than a "combination of slight abnormalities" and evidently had much more than a "minimal effect" on Plaintiff's ability to function. The finding by the ALJ that Plaintiff suffered from no severe impairments, therefore, was an obvious error.

## C. Plaintiff's treating physicians

Despite his determination at step two that Plaintiff did not suffer from any severe impairments, the ALJ attempted to make an alternative finding in which he assessed a residual functional capacity. (R. 24). Plaintiff argues that the ALJ erred in improperly analyzing the medical evidence of record when making this finding. Specifically, Plaintiff argues that the ALJ ignored opinions of disability proffered by Dr. Reyna, Dr. Weinberg, and Dr. Orr.

A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 422, 429 (3d. Cir. 1999), quoting, Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999). However, for controlling weight to be given to the opinion of a treating physician that opinion must be "well supported by medically acceptable clinical and laboratory diagnostic techniques and [ ] not inconsistent with other substantial evidence." 20 C.F.R. §§ 404.1527 (d)(2), 416.972 (d)(2). An ALJ may reject a treating physician's opinion outright on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided. Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir.1985). There are several factors that the ALJ may consider when determining what weight to give the opinion of the treating physician. 20 C.F.R. §404.1527, 416.927 (d)(2). They include the examining relationship, treating relationship

18

(its length, frequency of examination, and its nature and extent), supportability by clinical and laboratory signs, consistency, specialization, and other factors. 20 C.F.R. §404.1527 (d), 416.927 (d).

Generally, an ALJ may not make speculative inferences from medical reports and is not free to employ his own expertise against that of a physician who presents competent medical evidence. Fargnoli v. Massanari, 247 F.3d 34, 37 (3d Cir. 2001). When a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993). The ALJ must consider all the evidence and give some reason for discounting the evidence he rejects.Stewart v. Secretary of H.E.W., 714 F.2d 287, 290 (3d Cir.1983).

Plaintiff argues that the record is replete with evidence of his inability to function. In September 2005, Dr. Reyna opined that Plaintiff was permanently disabled as a result of dysphagia, cancer, and related malnutrition. (R. 261-262). Dr. Weinberg gave a similar opinion in June 2006 noting that Plaintiff was temporarily disabled starting June 6, 2006 to June 6, 2007 due to uncontrolled thyroid, dysphagia, and malnutrition. (R. 310). In October 2006, Dr. Weinberg indicated permanent disability due to "severe esophageal dismotility resulting in a 50# weight loss over the last year causing continuous profound weakness due to muscular atrophy" and "uncontrolled hypothyroidism leading to tachyarrhythmias with even minimal physical activity." (R. 307). In January 2007, Dr. Orr opined that Plaintiff was disabled due to major depressive disorder and anxiety disorder. (R. 568-569). He noted a number of symptoms resulting marked difficulties in all arenas of functioning and multiple episodes of decompensation. (R. 583, 585-587).

The ALJ improperly discredited these opinions with non-medical evidence requiring a remand for reconsideration of these reports. First, the ALJ discounted the opinion of Dr. Reyna based on the later determination that Plaintiff was not suffering from cancer. (R. 22). While cancer was later negated as a cause of Plaintiff's difficulties, Dr. Reyna also opined that Plaintiff was disabled due to dysphagia and malnutrition, issues that were well-documented in the medical evidence. (R. 22). The stated reason of Plaintiff "subsequently [being] found cancer-free and misdiagnosed" hardly discounts Dr. Reyna's opinions relating to dysphagia and malnutrition. Id. The ALJ similarly erred with relation to Dr. Weinberg's two opinions of disability based on the same issues with the addition of uncontrolled hypothyroid. (R. 22). While Plaintiff's hypothyroid was eventually bettered through radiation treatment, the ALJ did not adequately discount Plaintiff's continued difficulties swallowing or with his consistent weight loss and malnutrition due to a liquid diet. (R. 307). The ALJ, in fact, relied on certain pieces of evidence, while failing to discuss others completely. It is evident that ongoing attempts to find a cause for Plaintiff's dysphagia were completely ignored by the ALJ, including the subsequent diagnosis of myasthenia gravis. (R. 22-23).

The ALJ similarly failed in his rejection of Dr. Orr's mental capacity opinion due to a failure to cite to any medical evidence in contravention of Dr. Orr's findings. The ALJ relied strictly on a misstatement of Plaintiff's testimony relating to daily activities and the length of Plaintiff's treatment when rejecting the report of Dr. Orr. (R. 23). In his opinion, the ALJ failed to consider the findings from Plaintiff's initial psychological evaluation with Dr. Orr or any of the subsequent medication checks, which included mental status examinations. (R. 589, 591, 592-594). In addition, Plaintiff's anxiety was also notably recorded in the records of various other physicians and the hospital. (R. 242-243, 254, 323, 343). Since the ALJ failed to consider this

20

evidence, as well as improperly rejected all of the aforementioned opinions, this case will need to be remanded for reconsideration of the record.

## D. Listings 12.04 and 12.06

Plaintiff also argues that the ALJ erred in never reaching the issue of whether Plaintiff met one of the Listings, including Listings 12.04 and 12.06 as noted by Dr. Orr in his report. Considering the ALJ's errors at step two and in his formulation of residual functional capacity, this issue will obviously need to be addressed on remand. Step three is a necessary step in the sequential evaluation process and requires a finding on remand.

## E. Hypothetical Question to the VE

Plaintiff's final argument is related to the others. He claims that the hypothetical posed to the ALJ was defective because it did not include all of the work-related limitations found in the medical and testimonial record. For the reasons set forth above, the ALJ failed to support his conclusions with substantial evidence of record. Therefore, the hypothetical question posed to the VE was similarly flawed.

## IV. CONCLUSION

In conclusion, based of the evidence of the record and the briefs filed in support thereof, I find that the ALJ's opinion was not supported by substantial evidence. As a result, the case will be remanded for proceedings not inconsistent with this opinion.

*********************************

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOSEPH P. SHERBAUGH,                    )
                                        )
            Plaintiff,                  )
                                        )
      -vs-                              )     Civil Action No. 09-1268
                                        )
MICHAEL J. ASTRUE,                      )
COMMISSIONER OF SOCIAL                  )
SECURITY                               )
                                        )
            Defendant.                  )

AMBROSE, District Judge.

## ORDER OF COURT

AND NOW, this 4th day of June, 2010, it is Ordered that Defendant's Motion for

Summary Judgment (Docket No. 10) is DENIED. Plaintiff's Motion for Summary Judgment

(Docket No. 8) is GRANTED insomuch as it requests a remand not inconsistent with this

opinion. This case is closed forthwith.

BY THE COURT:

/s/ Donetta W. Ambrose
Donetta W. Ambrose,
U.S. District Judge